UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
______________________________________________X

HOWARD SINGER,

Plaintiff,

**VERIFIED COMPLAINT**

-against-

Docket Number:

CITY OF NEW YORK, JESSICA TISCH, Individually, and

RYAN MEROLA, Individually

Defendants.

______________________________________________**X**

Plaintiff HOWARD SINGER, by his attorneys, the Law Office of John A. Scola, PLLC, complaining of the Defendants respectfully as follows:

## PRELIMINARY STATEMENT

This civil rights action arises from the New York City Police Department's (hereinafter referred to as "NYPD") retaliatory destruction of the career and pension rights of Plaintiff Howard Singer, veteran NYPD Sergeant who served in senior executive roles across City government pursuant to New York City Charter § 821. After Plaintiff became professionally associated with First Deputy Mayor Randy Mastro—who publicly criticized NYPD operational decisions—the NYPD Commissioner, Defendant JESSICA TISCH, and her Chief of Staff, Defendant RYAN MEROLA, refused to approve Plaintiff's required § 821 waiver continuation for his City service. That refusal stripped Plaintiff of the statutory protections guaranteed by § 821, removed him from an elite executive assignment, relegated him to a punitive command, and ultimately forced his resignation from City service.

New York City Charter § 821 mandates that officers serving in exempt-class City positions retain their NYPD rank, rights, privileges, and pension status and must be restored to a competitive-class position on equal terms. Defendants intentionally violated that mandate. Their refusal was not administrative; it was retaliatory.

By denying Plaintiff's statutory restoration and pension protections and retaliating against him for protected association with a senior policymaker engaged in matters of public concern, Defendants deprived Plaintiff of property and associational rights secured by the Fourteenth and First Amendments. Acting under color of state law and as final NYPD policymakers, Defendants caused the loss of Plaintiff's career trajectory, pension benefits, reputation, and livelihood. Plaintiff brings this action pursuant to 42 U.S.C. § 1983 to redress those constitutional violations.

## NATURE OF THE CASE

1. This is an action under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments to the United States Constitution.
2. Plaintiff Howard Singer is a longtime NYPD Sergeant who served in senior City executive positions pursuant to New York City Charter § 821, including roles within the Department of Correction and later City Hall.
3. Section 821 provides that NYPD officers designated to exempt-class City positions retain all NYPD rank, rights, privileges, salary, and pension status and must be restored to their competitive-class position upon termination of exempt service on equal terms.
4. Plaintiff obtained a senior position with the New York City Department of Citywide Administrative Services ("DCAS"), which required continuation of his § 821 designation by the NYPD, to maintain payments into the police pension system.

5. Defendants Jessica TISCH, NYPD Commissioner, and Ryan MEROLA, her Chief of Staff, intentionally refused to approve Plaintiff's § 821 continuation despite the statute's mandatory protections.

6. The refusal occurred shortly after Plaintiff became associated with First Deputy Mayor Randy Mastro, who publicly criticized NYPD operations.

7. Defendants' refusal caused Plaintiff to lose his statutory restoration rights, pension protections, and executive assignment and resulted in his reassignment to an inferior NYPD command, forced resignation on January 2, 2026 and subsequent termination from his position at DCAS on February 6, 2026.

8. Defendants' actions were retaliatory and violated Plaintiff's constitutionally protected property and associational rights.

**JURISDICTION**

9. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

10. Plaintiff seeks redress for deprivation under color of state law of rights secured by the First and Fourteenth Amendments.

**VENUE**

11. Venue is proper in this District under 28 U.S.C. § 1391(b).

12. The acts and omissions giving rise to Plaintiff's claims occurred in the Southern District of New York, including NYPD Headquarters and City Hall in New York County.

13. Defendants are employed in this District, and the municipal Defendant resides here.

## PARTIES

14. Plaintiff HOWARD SINGER is a resident of the State of New York and a longtime NYPD Sergeant who served in exempt-class City executive positions pursuant to New York City Charter § 821.

15. Defendant CITY OF NEW YORK is a municipal corporation organized under the laws of the State of New York and is responsible for the acts, policies, practices, and customs of the New York City Police Department.

16. Defendant JESSICA TISCH is the Commissioner of the New York City Police Department. At all relevant times she exercised final policymaking authority over NYPD personnel decisions, § 821 waivers, interagency assignments, and restoration of officers serving in exempt-class positions. She is sued in her individual and official capacities.

17. Defendant RYAN MEROLA is the Chief of Staff to the NYPD Commissioner. At all relevant times he exercised supervisory authority over NYPD executive personnel decisions and participated directly in the refusal to approve Plaintiff's § 821 continuation and related adverse actions. He is sued in his individual and official capacities.

## FACTUAL ALLEGATIONS

18. Plaintiff joined the NYPD as a police officer in July 2007.

19. After successfully completing the Police Academy, Plaintiff was assigned to Impact Response in Midtown South in January 2008.

20. In July 2008, Plaintiff was assigned to the 6th Precinct.

21. At all times herein, Plaintiff excelled as a police officer.

22. Plaintiff worked in the 6th Precinct for eight years before he was promoted to Sergeant.

23. In August 2015, Plaintiff was promoted to Sergeant.

24. In October 2015, Plaintiff was transferred to the 13th Precinct where he worked as a sergeant.

25. At all times herein, Plaintiff excelled as a sergeant.

26. In June 2016, Plaintiff was selected to receive a New York City Police Foundation Scholarship.

27. Plaintiff applied for and was selected to attend Georgetown University from June 2016 until June 2017 where he earned his master's degree of policy management.

28. When Plaintiff returned from Georgetown University he was assigned to the Police Commissioner's and First Deputy Commissioner's offices.

29. In this role Plaintiff facilitated a brand new joint scholarship with the NYPD and Georgetown University's McCourt School of Public Policy.

30. This scholarship allowed members in both uniform and civilian ranks additional opportunities to attend Georgetown based on Plaintiff's work.

31. In 2019, Plaintiff was assigned to work for First Deputy Commissioner Benjamin Tucker.

32. Plaintiff was also selected by the Office of the Police Commissioner to help spearhead a new "Office of Professional Development" in conjunction with the New York City Police Foundation

33. In September 2019, Plaintiff became the speech writer for First Deputy Commissioner Tucker.

34. Plaintiff remained in this position until Commissioner Tucker left the NYPD in December 2021.

35. Plaintiff's stellar performance working under Commissioner Tucker did not go unnoticed.

36. Plaintiff was rewarded with a discretionary promotion to Sergeant Special Assignment in July 2021.
37. A Sergeant Special Assignment (SSA) in the New York City Police Department (NYPD) is a prestigious, merit-based designation granted by the Police Commissioner to Sergeants who exhibit exceptional performance, leadership, and specialized expertise.
38. This role often involves taking on high-impact, specialized duties that go beyond standard supervisory functions.
39. Plaintiff was rewarded for his stellar performance working for the highest executives in the NYPD.
40. On January 1, 2022, Eric Adams became the Mayor of New York City.
41. In January 2022, Louis Molina is named the Commissioner for the New York City Department of Correction ("DOC").
42. Plaintiff had worked with Molina in the NYPD.
43. Molina recruits Plaintiff to join him.
44. Plaintiff, who is an employee of the NYPD, is unsure how to work for Molina without harming his pension.
45. Plaintiff speaks with former Commissioner Tucker who informs him about the 821 Waiver.
46. Section 821. Officers or employees designated to serve in exempt civil service positions.
    a. Notwithstanding any provision in this charter to the contrary, the mayor or head of an agency may designate any officer or employee occupying a position in the competitive class of the civil service to serve in a position in the exempt class, and in such case, the officer or employee so designated shall thereupon enter upon and exercise all the powers and duties and receive the salary of such

exempt position, and shall retain all the rights, privileges and status of such officer or employee's position in the competitive class.

b. The appointment of any person chosen to fill the position thus left vacant shall be temporary and shall terminate upon the return of such officer or employee to such position as provided in subdivision e of this section.

c. Such designation shall be in writing and shall be filed and remain of record in the office of such agency, in the office of the commissioner and in the office of the mayor and shall remain in force until revoked by the mayor or head of such agency, as the case may be.

d. Service in such position in the exempt class shall be credited as service in the competitive class and the status of such officer or employee in respect to pensions or otherwise shall not be adversely affected by such designation.

e. Upon the termination of the officer or employee's services in such exempt position, except by dismissal for cause in the manner provided in section seventy-five of the civil service law, such officer or employee shall immediately and without further application return to the position in the competitive class with the status, rights, privileges and salary enjoyed immediately prior to the designation to the position in the exempt class.

47. Commissioner Tucker, himself, used the waiver under the Koch administration which allows a civil service worker to work out of title temporarily without harming their pension.

48. The waiver allows the City to temporarily utilize the skills of a distinguished employee for the betterment of the City.

49. In order to qualify under the waiver, which is extremely rare, Plaintiff must have the form signed by the head of his current agency and the agency that he will be working.
50. In this case it would need to be signed by the NYPD Commissioner (Keechant Sewell) and the DOC Commissioner, Louis Molina.
51. Once the Commissioner's sign the form, it must be approved by Mayor Adams.
52. In April 2022, Plaintiff is named the Deputy Chief of Staff to DOC Commissioner Louis Molina at DOC after obtaining the signatures and approval by Mayor Adams.
53. At the time of Plaintiff's approval only three people had a similar waiver.
54. While the waiver is supposed to last 365 days, Plaintiff is given an indefinite waiver which does not need to be renewed each year.
55. Plaintiff began to work for DOC as the Deputy Chief of Staff.
56. In that position, Plaintiff excelled as he helped DOC tackle the many issues it was having with staffing and covid-19.
57. DOC was also dealing with the federal monitor and pending litigation as Plaintiff worked for Molina.
58. The mayoral administration and Molina were looking to bolster the Law Department's defense in the litigation.
59. Molina informs Plaintiff that they are searching for outside counsel to assist the Law Department as counsel for the City.
60. Plaintiff speaks with Commissioner Tucker, an attorney, about the predicament.
61. Commissioner Tucker tells Plaintiff that he should introduce Louis (Molina) to attorney Randy Mastro who works at the law firm King & Spalding.

62. Plaintiff and Molina meet with Mastro in an effort to explore how King & Spalding can assist federal monitor litigation.
63. Despite the efforts of Plaintiff and the City, King & Spalding do not take over the litigation.
64. Molina subsequently leaves DOC and is named the Assistant Deputy Mayor of Public Safety by Mayor Adams.
65. In December 2023, Molina is replaced as Commissioner of DOC with Lynelle Maginley-Liddie.
66. Commissioner Maginley-Liddie retains Plaintiff as her Deputy Chief of Staff after taking over for Molina.
67. Plaintiff continues to excel under Commissioner Maginley-Liddie where he works for three years.
68. In March 2025, Randy Mastro is named First Deputy Mayor by Adams.
69. After his appointment, Mastro asks Plaintiff to join him to work in the Mayor's Office.
70. During the conversation, Mastro offers Plaintiff a job to come work for him.
71. Plaintiff is named a Senior Advisor to First Deputy Mayor Mastro.
72. In his new position, Plaintiff is tasked with assisting First Deputy Mayor Mastro in running the City and covering a Public Safety Portfolio.
73. In his capacity as Senior Advisor to the First Deputy Mayor, Plaintiff's responsibilities required him to associate closely with First Deputy Mayor Mastro on matters of public concern, including municipal public-safety policy, courthouse staffing, interagency coordination, and the NYPD's operational decisions. Plaintiff's association with Mastro on these matters was political and policy-based and was not part of Plaintiff's ordinary uniformed NYPD duties.

74. First Deputy Mayor Mastro is adamant on ensuring that his office does as good of job as possible while giving Mayor Adams the credit for its success.

75. When Mastro became the First Deputy Mayor there was an immediate issue within the Administration as to who Defendant TISCH reported.

76. Following the appointment of Mastro, there was in fighting within the Administration.

77. With the entrance of Mastro into the Administration, the methods of reporting changed.

78. Upon the restructuring of reporting lines within the Adams administration, Police Commissioner Defendant TISCH no longer reported to Chief of Staff Camille Varlack and instead reported directly to Mayor Adams and First Deputy Mayor Mastro.

79. This change altered internal influence dynamics within City Hall and exacerbated pre-existing professional tensions between Defendant TISCH and Chief of Staff Varlack.

80. The shift in authority coincided with broader friction among senior officials regarding reporting structures and access to the Mayor.

81. Defendant TISCH's relationship with First Deputy Mayor Mastro was likewise strained, particularly following Mastro's elevation to the second-highest position in City government.

82. Internal power struggles and competition for influence were widely recognized within the administration during this period.

83. As a result of those political dynamics, Defendant TISCH lacked practical authority to impose discipline on certain senior officials, notwithstanding her formal supervisory role.

84. These internal tensions and limitations on authority form part of the broader context in which the actions at issue in this case occurred.

85. Plaintiff in his role under First Deputy Mayor Mastro interacted regularly with the NYPD.

86. Plaintiff is tasked with dealing with public safety on City issues.

87. This includes but is not limited to calling politicians, agencies and people to help ensure City government runs as efficiently as possible.

88. Plaintiff would make calls on behalf of First Deputy Mayor Mastro.

89. In August 2025, Plaintiff was informed by Mastro a request be made for the NYPD to continue to man the courthouses to supervise inmates being taken to and from criminal court.

90. Specifically Mona Suazo who works under the Deputy Mayor of Public Safety informed Mastro and Plaintiff of the shortage of manpower and asked for the NYPD to take over the courthouse staffing in full.

91. Early in the Covid-19 pandemic, an extremely understaffed DOC, was unable to man the courthouses due to a shortage of staff.

92. The NYPD temporarily took over manning approximately 80% of the Court houses.

93. First Deputy Mayor Mastro directed Plaintiff to inform the Defendant MEROLA that from this point forward, they would be responsible for 100% of the staffing for the Bronx Courthouse.

94. Plaintiff contacts Defendant MEROLA by email on August 11, 2025, to inform him and the NYPD of the change in policy.

95. Defendant MEROLA responds to the email where he makes clear that the NYPD does not agree with the change and will not comply.

96. Defendant MEROLA's tone in email clearly shows he is upset by direction from Plaintiff acting on the request of First Deputy Mayor Mastro.

97. Defendant MEROLA's response to email includes a "plus" to Luis Martinez, Senior Advisor to Mayor Adams' Chief of Staff Camille Varlack.

98. Martinez responds that he will "loop in senior leadership."

99. Immediately after the email, Plaintiff is contacted by Defendant MEROLA about the email.

100. Plaintiff explains to Defendant MEROLA that the Order came from First Deputy Mayor Mastro.

101. Martinez is also the recipient of an 821 waiver as he is on loan to Mayor Adams's Chief of Staff Camille Varlack.

102. Prior to having the waiver signed, Martinez contacted Plaintiff and asked Plaintiff to explain the waiver process

103. Defendant MEROLA is clearly upset about the direction of court staffing from Plaintiff's email.

104. Defendant MEROLA referred to Plaintiff as "Howie," a nickname, despite the absence of any personal or familiar relationship between them.

105. The use of a nickname in this context was uninvited and inconsistent with the professional relationship between the parties.

106. Plaintiff is commonly known as Howard.

107. In reality Defendant MEROLA is angry with Plaintiff's email, and they do not want to be taking orders from First Deputy Mayor Mastro.

108. Defendant MEROLA responded angrily that direction not to take over the courthouses had already been made months earlier and the NYPD would not take over manning the courthouses without further discussion between the Police Commissioner and Chief of Staff Varlack.

109. Upon information and belief, Defendant TISCH directed Defendant MEROLA to respond on the NYPD's behalf because she opposed First Deputy Mayor Mastro's directive regarding courthouse staffing.

110. Defendant MEROLA was also angry that Plaintiff, a Sergeant Special Assignment, was directing him, the Chief of Staff to Defendant TISCH.

111. Plaintiff, having been told that the NYPD would not follow First Deputy Mayor Mastro's orders to man the courthouses, speaks with Mastro about the incident.

112. Plaintiff shows First Deputy Mayor Mastro the email back and forth.

113. First Deputy Mayor Mastro tells Plaintiff to forward the email to him.

114. First Deputy Mayor Mastro proceeds to respond to the email wherein he cc's Defendant TISCH, Defendant MEROLA, Kaz Daughtry, Mona Suazo, Camille Varlack, Tania Kinsella and Plaintiff.

115. First Deputy Mayor Mastro responds to Defendant MEROLA via email adding in with a cc to Defendant TISCH, Chief of Staff Varlack, First Deputy Commissioner Tania Kinsella, Deputy Mayor for Public Safety Kaz Daughtry, Mona Suazo, and Plaintiff of Defendant MEROLA's unprofessional response to Plaintiff.

116. First Deputy Mayor Mastro makes clear that the Order came from him.

117. Defendant TISCH immediately calls First Deputy Mayor Mastro to stick up for Defendant MEROLA who she claimed is a nice guy and asked Mastro "not to be mad at Ryan."

118. From this point forward, Defendant MEROLA and TISCH treat Plaintiff differently than they had previously.

119. In the Fall of 2025, it becomes clear that Mayor Adams is not going to win reelection.

120. Plaintiff begins to look for a new position as his work with First Deputy Mayor Mastro will end with the new administration.

121. First Deputy Mayor Mastro suggests to Plaintiff that he work for the City's Department of Citywide Administrative Services ("DCAS").

122. First Deputy Mayor Mastro communicates with Defendant TISCH about Plaintiff who agrees to sign the waiver to allow Plaintiff to continue working on loan with DCAS after Mayor Adams leaves office.

123. Plaintiff is informed that he can transition to a Senior Advisor position at the Department of Citywide Administrative Services.

124. Plaintiff is officially hired by DCAS as a "Senior Advisor to the Commissioner."

125. Plaintiff is informed that his 821 waiver and request to the Police Commissioner to continue his leave of absence from the NYPD while serving in a managerial capacity with DCAS is approved.

126. The waiver is submitted to the NYPD.

127. The waiver is handed to Defendant MEROLA.

128. Defendant MEROLA sits on the waiver for some time.

129. In November 2025, in a Police Commissioner's Office meeting attended by several people, Plaintiff's name comes up.

130. Defendant MEROLA states to several people in the meeting, "I am going to fuck that guy and enjoy it," referring to Plaintiff.

131. Louis Molina followed up with NYPD Chief of Personnel John Benoit, who stated on November 11, 2025 that Defendant TISCH would sign the § 821 waiver for Plaintiff.

132. On November 19, 2025, approximately 200 demonstrators gathered outside Park East Synagogue on the Upper East Side of Manhattan during a synagogue event hosted by Nefesh B'Nefesh, an organization that assists Jewish immigration to Israel.

133. Protesters were permitted to assemble immediately adjacent to the synagogue entrance, where they shouted anti-Israel and anti-Jewish slogans at congregants attempting to enter and exit the building for religious services.

134. Public reporting the following day described demonstrators positioned "at the door" of the synagogue, shouting phrases including "Globalize the Intifada," urging resistance to "take another settler out," and rejecting a two-state solution while congregants attempted to attend synagogue.

135. The NYPD, through Manhattan North precinct leadership, had operational responsibility for protest permitting and security planning for the November 19, 2025 event.

136. The Department's plan did not include a frozen or buffer zone at the synagogue entrance, resulting in what NYPD leadership later described as a chaotic condition directly outside the doors of the house of worship.

137. On November 22, 2025, Defendant TISCH personally addressed approximately 150 congregants at Park East Synagogue and publicly acknowledged that the NYPD had failed to keep the synagogue entrance clear.

138. Defendant TISCH stated that the Department's plan "didn't include a frozen zone at the entrance" and that, as a result, "the space right outside [the] steps was chaotic," adding: "That is where we fell short, and for that, I apologize to this congregation."

139. While Mayor Eric Adams was overseas, Acting Mayor Randy Mastro publicly criticized the NYPD response, stating that demonstrators had been allowed "too close to the entry of the synagogue," that police "should have controlled that crowd more," and that protesters "never should have been that close" to congregants attempting to worship. Acting Mayor Mastro further stated that demonstrators had said "very vile things" and that such proximity to a house of worship "is not acceptable in our city."

140. On November 23, 2025, the New York Post reported on the incident and the NYPD's handling of the protest, including Mastro's comments.

141. Following the November 23, 2025 public criticism of the NYPD's handling of the November 19th synagogue protest, Defendant TISCH's anger regarding the incident and its media fallout was communicated to First Deputy Mayor Mastro and Plaintiff Singer directly and through intermediaries within the NYPD executive staff and City Hall communications structure.

142. Immediately following Mastro's public criticism of the NYPD defendant TISCH texted Mastro with a link to the article questioning his friendship

143. The text stated "with friends like these…"

144. Defendant TISCH questioned Mastro's motives and ethics.

145. The insinuation was that Defendant TISCH was angry at First Deputy Mayor Mastro for criticizing the NYPD publicly.

146. In or about late November 2025, Plaintiff was informed by senior NYPD leadership and/or executive staff that Defendant TISCH was upset about Acting Mayor Mastro’s public criticism and the resulting press coverage and was attributing responsibility for the negative media cycle to Plaintiff in his capacity as a senior communications official.

147. At the time Defendants refused to approve Plaintiff’s § 821 continuation, Plaintiff was not in a confidential or policymaking position with respect to the NYPD, had no role in setting NYPD policy, and was not in a position for which political loyalty to the NYPD Commissioner was an appropriate qualification for the effective performance of his duties.

148. Chief of Personnel John Benoit informs Louis Molina, that Defendant TISCH will no longer sign the 821-waiver allowing Plaintiff to continue his leave of absence from the NYPD while serving in a managerial capacity.

149. Over the course of several days in late November 2025, Mastro and Defendant TISCH communicated back and forth presumably by text messages, where Mastro is pleading for Defendant TISCH (whom Mastro calls Jessie as he has a long-standing relationship with the Tisch family) to not take out her anger of Mastro's statements on his advisor, Plaintiff.

150. Defendant TISCH informs Mastro that she is not signing the waiver and that if Plaintiff wants to return to the NYPD he can come back as a sergeant.

151. Defendant TISCH further states that Plaintiff is “not a friend of the NYPD.”

152. Defendant TISCH also tells First Deputy Mayor Mastro that she is dealing with a lot of corruption and that Plaintiff is tied in with the Adams administration.

153. Plaintiff is retaliated against by the Defendants herein based on his association with Randy Mastro.

154. Plaintiff was further told that Defendant TISCH believed the Department had been publicly embarrassed and that she held Mastro and those associated with him, like Plaintiff, responsible for the perceived reputational damage and City Hall fallout arising from the synagogue-protest controversy and subsequent reporting.

155. Mastro continues to speak with Defendant TISCH to ensure that Plaintiff is not retaliated against for her biases against him.

156. The conversation continues throughout the weekend following Thanksgiving 2025.

157. Despite Mastro's continuous efforts throughout the weekend, Defendant TISCH refuses to sign the waiver.

158. Mastro explicitly informs Defendant TISCH that she is improperly retaliating against Howard (Plaintiff) who had done nothing wrong except follow orders.

159. Defendant TISCH refuses to sign the waiver, telling Mastro, Plaintiff can come back and work at the NYPD as a Sergeant.

160. Defendant TISCH continues to refuse to sign Plaintiff's waiver.

161. Plaintiff speaks with his former boss, former NYPD First Deputy Police Commissioner Benjamin Tucker.

162. Commissioner Tucker subsequently contacts Defendant TISCH.

163. On the call about Plaintiff, Defendant TISCH states that she is dealing with alleged corruption involving individuals associated with Mayor Adams and that she cannot bring back an "Adams' guy" which is why she refused to sign the waiver.

164. Commissioner Tucker, having also received the 821 waiver, offers to call Defendant TISCH in an effort to explain the 821 waiver process, the detrimental effect towards lifetime pension earnings if she does not approve waiver, in addition to how only

a select few personnel are identified and granted the 821 waiver to serve in managerial capacities with other city agencies while on leave from the NYPD.

165. Defendant TISCH informs Commissioner Tucker that Plaintiff is an "Adams' guy" (referring to the Mayor) and that she cannot sign the waiver for an "Adams' guy."

166. It is explained to Defendant TISCH on the call that Plaintiff is not an “Adams' guy” and it was him (Tucker) who brought him into the First Deputy's office and bolstered his career based on his stellar performance.

167. Tucker further explains that Plaintiff was selected to help the previous administration based on his stellar credentials and performance and is not part of the “Adams' crew.”

168. Following the explanation Defendant TISCH states on the call that she will sign the waiver.

169. Plaintiff waits for Defendant TISCH to sign the waiver.

170. Around this time in early December Plaintiff is informed of Defendant MEROLA's statements from the November meeting where he used expletives to describe Plaintiff.

171. By mid-December Plaintiff is getting worried at the delay in signing the waiver.

172. Plaintiff contacts the pension section and considers resigning due to the hostility from Defendant TISCH.

173. Plaintiff speaks with Commissioner Tucker who advises him not to resign.

174. Plaintiff decides against resigning at that time.

175. On December 15, 2025, Plaintiff is emailed by Chief of Personnel John Benoit.

176. Plaintiff is informed by Chief Benoit that there is no indefinite leave for anyone, any indefinite leave expires on December 31, 2025 and moving forward, all waivers will have to be signed off annually.

177. Shortly thereafter, an email is sent stating that no NYPD employee would be allowed to have indefinite leave after December 31, 2025.

178. Plaintiff speaks with Chief Benoit after that who informs him to resubmit the waiver package for Defendant TISCH's review.

179. Chief Benoit states that he will find out the status of Plaintiff's waiver.

180. On December 31, 2025, Chief Benoit informs Plaintiff that Defendant TISCH is not going to sign the waiver and he will be transferred to the Bronx Court Section.

181. Plaintiff asks if it was Defendant TISCH who called Chief Benoit.

182. Chief Benoit says it was someone close to her.

183. When Plaintiff asks if it was Defendant MEROLA, Chief Benoit refuses to answer the question.

184. Upon information and belief, the communication originated from Defendant MEROLA.

185. Chief Benoit then informs Plaintiff that when he returns to the NYPD he will be assigned to the Bronx Court Section.

186. It is not a coincidence that Plaintiff was assigned to the same place that First Deputy Mayor Mastro ordered the NYPD to maintain in lieu of DOC.

187. Prior to Plaintiff leaving his NYPD civil service title he worked as a speech writer for First Deputy Commissioner Benjamin Tucker.

188. That assignment carried significant prestige, visibility, and career-advancing responsibilities and was widely regarded within the NYPD as a coveted headquarters post with substantial overtime opportunities and upward mobility.

189. When Plaintiff left the NYPD to work for the City Government he left a prestigious position.

190. While serving in the assignment with City Government, Plaintiff retained all rights, privileges, and status of his underlying competitive-class civil service position and was supposed to be returned to an equal position within the NYPD.

191. When Plaintiff's exempt service concluded and he returned from that assignment, Defendants failed to restore him to a competitive-class position with the same status, rights, privileges, responsibilities, and career trajectory he had enjoyed prior to and during his designated service.

192. Instead, Defendants reassigned Plaintiff to the Bronx Court Section, a known punitive post within the NYPD that lacks comparable prestige, responsibility, overtime opportunity, or advancement potential and is widely understood to derail career progression.

193. Plaintiff's reassignment was not the result of any performance deficiency, disciplinary finding, or lawful reorganization, and no charges were brought against him pursuant to Civil Service Law § 75.

194. Upon information and belief, Plaintiff's exempt designation was never lawfully revoked in writing or filed as required by New York City Charter § 821, and Plaintiff was not returned to an equivalent competitive-class assignment upon the conclusion of his exempt service.

195. By relegating Plaintiff to Bronx Court Section rather than restoring him to a position of equivalent status and career opportunity, Defendants materially diminished his professional standing within the NYPD, reduced his overtime and compensation opportunities, eliminated his visibility and promotional prospects, and effectively ended his upward career mobility.

196. New York City Charter § 821 guarantees that an officer designated to serve in an exempt position retains the full rights, privileges, and status of the competitive-class title and, upon termination of exempt service absent dismissal for cause, must be returned to a position with the same status, rights, privileges, and salary enjoyed prior to the designation.

197. Defendants' failure to restore Plaintiff to an equivalent position upon his return from exempt service, and their punitive reassignment of him to Bronx Court Section, violated these statutory protections.

198. As a direct and proximate result, Plaintiff suffered loss of prestige, diminished career trajectory, reduced earnings and overtime opportunities, and long-term professional harm.

199. Plaintiff's assignment within the Office of the First Deputy Commissioner constituted a highly prestigious headquarters posting that carried significant professional visibility, responsibility, and advancement potential within the NYPD.

200. Upon completion of that designated service, Plaintiff had a statutory and established entitlement under New York City Charter § 821 and Civil Service Law § 75 to be restored to a competitive-class position of equivalent status, privileges, responsibilities, and career trajectory absent charges or discipline for cause.

201. Plaintiff was not charged, disciplined, or afforded any notice or opportunity to be heard before being denied restoration to an equivalent position and reassigned instead to the Bronx Court Section, a materially inferior and punitive post.

202. The failure to restore Plaintiff to an equivalent position and the imposition of a career-ending reassignment without charges or process deprived Plaintiff of protected property and liberty interests without due process of law.

203. Plaintiff's reassignment occurred in the context of, and in retaliation for, his protected speech and criticism concerning NYPD leadership and matters of public concern arising from his work within the First Deputy Mayor's Office.

204. After the conversation, a FINEST message is sent out stating that Plaintiff is being transferred to the Bronx Court Section.

205. This FINEST message is sent to the entire NYPD and embarrasses Plaintiff.

206. The demotion to the Bronx Court Section is also publicized in the media which further embarrasses Plaintiff's standing within the NYPD and City government.

207. The assignment of Bronx Court Section is effectively ending Plaintiff's career any chance of upward mobility within the NYPD after serving in top executive posts.

208. The offer of Plaintiff to return to the Bronx Court Section from the 1st Deputy Commissioner's office is in violation of the 821 waiver and denies Plaintiff due process afforded by statute.

209. Plaintiff was eighteen months away from reaching his full NYPD pension which is obtained after twenty years of service.

210. Plaintiff is informed that if he returns to the NYPD and is assigned to the Bronx Court Section, his pension after his 20th year will be reduced by 37%

211. Plaintiff is informed that if he retired from the NYPD immediately before he reaches his 20th year his pension will be reduced by 26%.

212. Lastly, Plaintiff is informed that if Defendant TISCH signed the waiver, his pension would reach its full monetary value based on his managerial salary.

213. After Plaintiff is informed of the changes in pension, he informs Mastro of the vast differences in money and that he will be forced to resign if Defendant TISCH continues to retaliate against him and refuse to sign the waiver.

214. Mastro again calls Defendant TISCH and explains the situation including the exact numbers and money that he will be losing over the course of his life due to the retaliation.

215. Defendant TISCH responded that Plaintiff could either return to the NYPD as a Sergeant or resign, despite being informed of the substantial pension loss Plaintiff would suffer.

216. Plaintiff has no choice but to submit his retirement papers from the NYPD.

217. Plaintiff formally submits his retirement papers to the NYPD on January 2, 2026.

218. As a result of being forced to leave the NYPD early, Plaintiff foregoes his variable supplement and cost of living increase which are given to members of service who reach 20 years of service.

219. As a result, Plaintiff will lose $36,000 a year for the remainder of his life.

220. Plaintiff, as a result of the retaliatory actions of Defendant TISCH, was constructively discharged from the NYPD.

221. Specifically, a reasonable person in Plaintiff's position, when faced with a drop in pay, demotion and loss of pension, would have felt compelled to resign from the NYPD if they were being treated in a similar manner to Plaintiff.

222. Defendants deliberately imposed conditions that made continued NYPD employment objectively intolerable, including denial of statutory pension protections, reassignment to a punitive command, and loss of career status, thereby forcing Plaintiff's resignation.

223. Despite Defendant TISCH refusing to sign the waiver, Plaintiff is informed that DCAS still would like Plaintiff to work for the agency.

224. Plaintiff is unable to join DCAS for 30 days following the submission of his retirement papers with the NYPD.

225. Specifically, Plaintiff is unable to work two City jobs and must wait 30 days while his NYPD pension documents are being processed.

226. After sitting out for 30 days while his pension is finalized, Plaintiff is scheduled to begin work for DCAS on February 2, 2026.

227. Plaintiff is scheduled to meet with Commissioner Yume Kitasei on February 4, 2026.

228. On February 6, 2026, Plaintiff Howard Singer's employment with the New York City Department of Citywide Administrative Services ("DCAS") was abruptly terminated without prior discipline, investigation, or articulated performance-based justification.

229. Prior to Plaintiff's termination, the Defendant CITY leaked to the media outlet City & State that several DCAS employees were being terminated due to their connection with former DCAS Deputy Commissioner Jesse Hamilton.

230. Plaintiff was terminated the same day as the story was written.

231. At the time of his termination, Singer had never worked under or with former DCAS Deputy Commissioner Jesse Hamilton, had no involvement in any contracts or

matters associated with Hamilton, and had not been employed at DCAS during Hamilton's tenure.

232. The following day, media outlets reported that the Mamdani administration had initiated a DCAS "reorganization" purportedly targeting employees allegedly linked to corruption associated with Hamilton.

233. The reporting suggested that multiple employees terminated on or about February 6, 2026 were connected to or "installed" by Hamilton.

234. That narrative was false as applied to Plaintiff.

235. He had no professional, supervisory, or operational connection to Hamilton whatsoever.

236. Upon information and belief, the public framing of the DCAS terminations as corruption-related cleanup was used to obscure the retaliatory motive for Plaintiff's termination and to provide political cover for adverse employment actions taken against individuals who were not in fact associated with Hamilton or any alleged misconduct.

237. Singer's termination therefore lacked any legitimate non-retaliatory basis and was pretextual.

238. Plaintiff alleges that the actual motive for his termination was retaliation directed or influenced by NYPD Commissioner Jessica TISCH, who had become aware of Plaintiff's association with First Deputy Mayor Mastro and Defendants' perception that Plaintiff was aligned with Mastro's criticism of NYPD leadership.

239. Specifically, upon information and belief, Defendants TISCH and/or MEROLA, were instrumental in convincing the incoming Mamdani Administration that Plaintiff was part of the Mayor Adams network of cronyism and illegality.

240. In fact, Plaintiff is a career government worker who is loyal to no one but the Defendant CITY.

241. Plaintiff, in the time Mayor Adams was in office, spoke with him on one occasion for one minute.

242. The exchange consisted of pleasantries and an introduction.

243. Plaintiff has no other association with Mayor Eric Adams.

244. The timing of Plaintiff's termination—coinciding with the leaked DCAS reorganization narrative—and the absence of any Hamilton connection or performance-based justification further demonstrate that the stated rationale was pretext for retaliation.

245. Plaintiff was informed that he was being terminated as part of the purported "housecleaning."

246. Upon information and belief, Defendant TISCH communicated directly or indirectly with senior DCAS or City Hall officials concerning Plaintiff and expressed that he was aligned with or installed by the prior administration and should not be retained in City employment.

247. Plaintiff's DCAS termination occurred shortly thereafter and in temporal proximity to TISCH's refusal to approve his § 821 continuation.

248. To date Plaintiff remains out of work.

249. At all relevant times, Defendants acted under color of state law and within the scope of their employment with the City of New York and the New York City Police Department ("NYPD"), and deprived Plaintiff of rights secured by the Constitution and laws of the United States, including the First and Fourteenth Amendments, in violation of 42 U.S.C. § 1983.

250. Plaintiff was at all relevant times a competitive-class NYPD Sergeant who was formally designated pursuant to New York City Charter § 821 to serve in exempt-class positions within City government, including senior executive roles outside the NYPD.

251. New York City Charter § 821 expressly provides that an officer designated to serve in an exempt position retains all rights, privileges, rank, salary, and pension status of the competitive-class position and, upon termination of exempt service, "shall immediately and without further application return to the position in the competitive class with the status, rights, privileges and salary enjoyed immediately prior to the designation."

252. The statute further provides that service in an exempt position "shall" be credited for pension purposes and that the officer's pension status "shall not be adversely affected" by such designation.

253. The mandatory and nondiscretionary language of § 821 created for Plaintiff a legitimate claim of entitlement to restoration to his competitive-class NYPD status on equal terms, preservation of rank and career trajectory, and pension status unaffected by his exempt-class service.

254. Plaintiff therefore possessed constitutionally protected property interests in his rank, position, career status, and pension rights under § 821 and under established NYPD custom and practice concerning waiver approvals for officers serving in exempt-class City positions. Defendants were aware of Plaintiff's § 821 status and of the mandatory statutory protections attached thereto.

255. In or about 2025, Plaintiff obtained a senior City position with the New York City Department of Citywide Administrative Services ("DCAS"), which required NYPD

approval of a continuation or renewal of his § 821 designation to preserve his statutory status and pension rights.

256. Defendant Jessica TISCH, acting in her capacity as NYPD Commissioner and final policymaker for NYPD personnel and waiver determinations, intentionally and without lawful basis refused to execute or approve the required § 821 waiver or continuation.

257. Despite the FINEST message, on December 30, 2025, Luis Martinez is approved for indefinite leave by Defendant TISCH.

258. To date, Martinez is on indefinite leave from his civil service title with the NYPD.

259. The disparate treatment of Luis Martinez—another NYPD officer serving on § 821 leave under City Hall—demonstrates that Defendants' refusal to approve Plaintiff's continuation was not based on policy or administrative constraint but on retaliatory animus. Martinez's leave was approved by Defendant TISCH on December 30, 2025 while Plaintiff's identical request was denied.

260. As a direct result of Defendants' refusal to honor Plaintiff's § 821 rights, Plaintiff was denied restoration to his prior competitive-class status on equal terms; his career trajectory and pension status were materially diminished; he was removed from a highly desirable executive assignment; he was reassigned to an inferior command widely understood within the NYPD as punitive; and he ultimately was forced to resign the NYPD on or about January 2, 2026, foregoing his full pension contributions and causing a 26% reduction in annual pension payments for life.

261. Defendants' actions deprived Plaintiff of the statutory rights guaranteed by § 821 and therefore of protected property interests secured by the Fourteenth Amendment.

262. Defendants deprived Plaintiff of these protected interests without notice of any lawful basis for denying his § 821 rights and without any opportunity to be heard.

263. Plaintiff was not provided pre-deprivation notice of the grounds for denying the waiver, an opportunity to respond to the decision-maker, or any post-deprivation hearing capable of restoring his statutory status.

264. Because § 821 confers mandatory restoration and pension protections, Defendants lacked discretion to deny Plaintiff's rights and were required, at minimum, to provide constitutionally adequate procedures before depriving him of those interests.

265. Defendants' conduct therefore constituted a deprivation of property without due process of law in violation of the Fourteenth Amendment.

266. At all relevant times, Plaintiff served as an advisor and close professional associate of First Deputy Mayor Randy Mastro in matters concerning City public-safety operations, including the staffing and management of correctional facilities.

267. Mastro publicly criticized NYPD operational decisions regarding protest response. The issue of significant public concern involving public safety, policing, and municipal governance.

268. Defendants were aware of Plaintiff's association with Mastro, and perceived Plaintiff as aligned with and supportive of Mastro's criticisms of NYPD leadership from the Park East Synagogue.

269. In direct response to that association, Defendant TISCH and other NYPD officials expressed hostility toward Plaintiff and his affiliation with Mastro, including written communications reflecting retaliatory animus, and shortly thereafter refused to approve

Plaintiff's § 821 waiver, removed him from an elite assignment, reassigned him to an inferior command, and caused his constructive termination from City employment.

270. Defendants' actions were motivated, at least in substantial part, by Plaintiff's protected association with Mastro and by Defendants' disagreement with Mastro's public criticisms.

271. A reasonable public employee would be deterred from associating with senior policymakers engaged in public-concern speech if faced with the career destruction inflicted on Plaintiff.

272. Defendants' conduct therefore constituted retaliation for protected expressive association in violation of the First and Fourteenth Amendments.

273. At all relevant times, Defendant TISCH was the final policymaker for NYPD personnel determinations, § 821 waivers, interagency assignments, and restoration of officers serving in exempt-class positions.

274. The refusal to approve Plaintiff's § 821 waiver and the resulting deprivation of his statutory rights were made by this final policymaker and therefore constitute official municipal policy attributable to the City of New York.

275. Additionally, NYPD maintained customs and practices of retaliating against officers perceived as aligned with external City leadership critical of NYPD operations and of denying or obstructing § 821 restoration rights for retaliatory reasons.

276. These policies, customs, and decisions directly caused the constitutional violations suffered by Plaintiff.

277. As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiff suffered loss of employment, loss of career advancement, loss and diminution of pension

and retirement benefits, reputational harm, emotional distress, and other economic and non-economic damages in an amount to be determined at trial.

## CAUSES OF ACTION

## COUNT I

## 42 U.S.C. § 1983 — Deprivation of Property Without Procedural Due Process (Against All Defendants)

278. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

279. At all relevant times, Plaintiff possessed constitutionally protected property interests in his NYPD rank, position, career status, and pension rights pursuant to New York City Charter § 821 and established NYPD practice.

280. Section 821 mandates that officers serving in exempt-class City positions retain all competitive-class rights, privileges, rank, salary, and pension status and must be restored to their competitive-class position on equal terms upon termination of exempt service.

281. Defendants intentionally refused to approve or continue Plaintiff's § 821 designation required for his City service, thereby denying him the statutory restoration and pension protections guaranteed by law.

282. As a direct result, Plaintiff was deprived of his protected rank, status, career trajectory, and pension rights and was forced from City employment.

283. Defendants deprived Plaintiff of these property interests without notice of lawful grounds and without any meaningful opportunity to be heard.

284. Plaintiff received neither pre-deprivation process nor post-deprivation process capable of restoring his statutory status.

285. Defendants' conduct constituted deprivation of property without due process of law in violation of the Fourteenth Amendment.

286. At all relevant times, Defendants acted under color of state law.

287. As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiff suffered the damages alleged herein.

**COUNT II**
**42 U.S.C. § 1983 — First Amendment Retaliation (Political Affiliation and Public-Concern Speech)**
**(Against Individual Defendants)**

288. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

289. Plaintiff's association with First Deputy Mayor Randy Mastro was a constitutionally protected political and expressive association. The First Amendment prohibits public employers from taking adverse employment action against employees based on their actual or perceived political affiliation or association with a public official, except where party or political loyalty is an appropriate requirement for effective performance of the position. See Elrod v. Burns, 427 U.S. 347 (1976); Branti v. Finkel, 445 U.S. 507 (1980); Heffernan v. City of Paterson, 578 U.S. 266 (2016); Morin v. Tormey, 626 F.3d 40 (2d Cir. 2010); Gordon v. County of Rockland, 110 F.3d 886 (2d Cir. 1997).

290. Plaintiff's position as a Sergeant Special Assignment serving on a § 821 designation as Senior Advisor to the First Deputy Mayor was not a policymaking, confidential, or politically sensitive position for which loyalty to the NYPD Commissioner was an appropriate qualification. See Branti, 445 U.S. at 518; Vezzetti v. Pellegrini, 22 F.3d 483 (2d Cir. 1994).

291. Defendants perceived Plaintiff as politically aligned with First Deputy Mayor Mastro and as supportive of his public criticism of NYPD leadership. Defendant TISCH expressly stated that Plaintiff was "not a friend of the NYPD," was an "Adams' guy," and that she "cannot bring back an Adams' guy." Defendant TISCH's contemporaneous "with friends like these…" text message to First Deputy Mayor Mastro, sent immediately following his public criticism of the NYPD's handling of the Park East Synagogue protest, further evidences that Plaintiff's perceived political affiliation was a substantial and motivating cause of Defendants' adverse actions. Even if Defendants were mistaken regarding the nature or extent of Plaintiff's actual political affiliation, retaliation based on perceived political affiliation independently violates the First Amendment. Heffernan, 578 U.S. at 273; Patrolmen's Benevolent Ass'n v. City of New York, 310 F.3d 43 (2d Cir. 2002).

292. In the alternative, and independently, Plaintiff was retaliated against based on his association with First Deputy Mayor Mastro's protected speech on matters of public concern. Mastro's November 22–23, 2025 public statements criticizing the NYPD's failure to establish a frozen zone outside Park East Synagogue and to control demonstrators harassing congregants engaged in religious worship addressed matters of intense public concern, including public safety, religious liberty, the response to antisemitism, the adequacy of municipal policing, and the conduct of senior City officials. See Pickering v. Bd. of Educ., 391 U.S. 563 (1968); Connick v. Myers, 461 U.S. 138 (1983); Lane v. Franks, 573 U.S. 228 (2014); Matthews v. City of New York, 779 F.3d 167 (2d Cir. 2015).

293. Plaintiff's association with Mastro on these matters — including Plaintiff's role as Mastro's senior advisor on the public-safety portfolio and as the conduit communicating

Mastro's policy directives to NYPD leadership — was undertaken in Plaintiff's capacity as a citizen-advisor to a senior elected official engaged in public-concern speech, and not pursuant to Plaintiff's ordinary, day-to-day duties as a uniformed NYPD Sergeant. See Garcetti v. Ceballos, 547 U.S. 410 (2006); Jackler v. Byrne, 658 F.3d 225 (2d Cir. 2011); Matthews, 779 F.3d at 173–75. Under the Pickering balancing test, the public interest in Mastro's criticism of NYPD operations — and in Plaintiff's freedom to associate with and advise a senior elected policymaker on public-safety matters — substantially outweighs any legitimate interest of the NYPD in workplace efficiency, internal harmony, or discipline.

294. Defendants' retaliatory acts — including the refusal to approve Plaintiff's § 821 waiver, removal from his City Hall assignment, reassignment to the Bronx Court Section, departmental publication of the demotion via FINEST message, constructive discharge from the NYPD, and the orchestrated termination from DCAS — would deter a person of ordinary firmness from engaging in protected association with senior policymakers or from supporting public-concern speech. See Zelnik v. Fashion Inst. of Tech., 464 F.3d 217 (2d Cir. 2006); Dawes v. Walker, 239 F.3d 489 (2d Cir. 2001).

295. Plaintiff's protected political and expressive association with First Deputy Mayor Mastro, and with Mastro's public-concern speech, was a substantial and motivating factor in Defendants' adverse employment actions. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977); Smith v. County of Suffolk, 776 F.3d 114 (2d Cir. 2015). Defendants would not have taken these adverse actions in the absence of Plaintiff's protected association, as demonstrated by the close temporal proximity between Mastro's November 22–23, 2025 public criticism and Defendant TISCH's refusal to approve the

waiver days later, and by Defendants' disparate treatment of Luis Martinez — a similarly situated NYPD officer on § 821 leave to City Hall whose indefinite-leave waiver Defendant TISCH approved on December 30, 2025, while denying Plaintiff's materially identical request.

296. At all relevant times, Defendants acted under color of state law. As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff suffered loss of his NYPD career and rank, loss of pension and retirement benefits, loss of his City employment, reputational harm, emotional distress, and other economic and non-economic damages in an amount to be determined at trial.

**COUNT III**
**Municipal Liability — 42 U.S.C. § 1983 (Monell)**
**(Against City of New York)**

297. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

298. Defendant Jessica TISCH, as NYPD Commissioner, possessed final policymaking authority over NYPD personnel determinations, § 821 waivers, interagency assignments, and restoration of officers serving in exempt-class positions.

299. The refusal to approve Plaintiff's § 821 continuation and the resulting deprivation of his statutory rights were decisions of this final policymaker and therefore constitute official municipal policy.

300. Additionally, the NYPD maintained customs, practices, and usages of retaliating against officers perceived as aligned with external City leadership critical of NYPD operations and of denying or obstructing § 821 restoration rights for retaliatory reasons.

301. These policies, customs, and decisions directly caused the constitutional violations suffered by Plaintiff.

302. Defendant TISCH's decisions regarding § 821 waivers were not subject to meaningful review within the NYPD.

303. As a direct and proximate result of the City's policies and actions, Plaintiff suffered the damages alleged herein.

## COUNT IV
## 42 U.S.C. § 1983 — Substantive Due Process
## (Conscience-Shocking Conduct)
## (Against Individual Defendants)

304. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

305. At all relevant times, Plaintiff possessed constitutionally protected life, liberty, and property interests, including in his NYPD rank and career, his accrued pension credits, his statutory rights and protections under New York City Charter § 821, and his approaching pension vesting as a twenty-year veteran public servant.

306. The substantive component of the Due Process Clause of the Fourteenth Amendment protects individuals from arbitrary and oppressive exercises of government power, including official conduct that is so egregious, so outrageous, and so unjustified by any legitimate governmental interest that it shocks the contemporary conscience.

307. Conduct undertaken with the deliberate and express intent to injure, and unjustified by any legitimate government interest, is the category of official action most likely to rise to the conscience-shocking level.

308. Defendants TISCH and MEROLA, acting individually and under color of state law, engaged in a deliberate, knowing, and sustained course of conduct directed at Plaintiff, undertaken with the express intent to injure Plaintiff, and unjustified by any legitimate governmental interest.

309. Defendant MEROLA, the Chief of Staff to the NYPD Commissioner, expressly declared of Plaintiff in the course of NYPD executive deliberations, "I am going to fuck that guy and enjoy it." This statement evidences Defendant MEROLA's deliberate purpose to inflict harm on Plaintiff for reasons unmoored from any legitimate government interest.

310. Defendant TISCH, the Police Commissioner of the City of New York, was expressly warned by First Deputy Mayor Randy Mastro — contemporaneously with her decision to refuse Plaintiff's § 821 waiver continuation — that her refusal constituted improper retaliation against Plaintiff. Defendant TISCH proceeded with the refusal notwithstanding that express warning and with actual notice that her conduct was unlawful.

311. The timing of Defendants' refusal to approve Plaintiff's § 821 continuation was deliberately engineered to coincide with and maximize the destruction of Plaintiff's pension interests, occurring approximately eighteen months before Plaintiff's twenty-year pension vesting date and producing a lifetime pension reduction of approximately 26%, the loss of approximately $36,000 per year in Variable Supplement Fund benefits, and the forfeiture of other retirement benefits earned through two decades of public service.

312. Defendants' refusal to approve the § 821 continuation, the resulting reassignment of Plaintiff to a punitive command, and the orchestrated destruction of Plaintiff's career and pension were not the product of any considered, legitimate, or rational personnel

judgment, but a deliberate and knowing course of conduct executed for the purpose of inflicting harm on Plaintiff.

313. The combined effect of Defendants' conduct — (i) refusing Plaintiff's § 821 continuation with express animus; (ii) proceeding with the refusal in the face of explicit, contemporaneous notice that the conduct was improper retaliation; (iii) engineering the timing of the deprivation to destroy a near-vested public pension earned through twenty years of service; and (iv) directing the cascade of adverse personnel actions that followed — constituted an abuse of official power so egregious and so unjustified by any legitimate governmental interest as to shock the contemporary conscience.

314. Defendants' conduct violated the substantive component of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

315. At all relevant times, Defendants TISCH and MEROLA acted under color of state law.

316. As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiff suffered the damages alleged herein, including but not limited to loss of his NYPD rank and career, loss of pension and retirement benefits, loss of income, reputational harm, emotional distress, and other economic and non-economic damages in an amount to be determined at trial, together with punitive damages against the individual Defendants and attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Howard Singer respectfully requests that this Court enter judgment in his favor and against Defendants, and award the following relief:

A. A declaration that Defendants' acts, policies, practices, and conduct described herein violated Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution;

B. Compensatory damages in an amount to be determined at trial, including but not limited to lost earnings, lost career advancement, loss and diminution of pension and retirement benefits, reputational harm, and emotional distress;

C. Back pay, front pay, and all economic losses resulting from Defendants' unconstitutional conduct;

D. Restoration of Plaintiff's statutory rights, status, rank equivalency, and pension position to the extent equitable and available under law;

E. Injunctive and equitable relief requiring Defendants to recognize and honor Plaintiff's rights under New York City Charter § 821 and to remove or correct adverse personnel determinations resulting from the unconstitutional conduct described herein;

F. Punitive damages against the individual Defendants in their individual capacities;

G. Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

H. Pre-judgment and post-judgment interest as permitted by law; and

I. Such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: New York, NY

May 22, 2026

Respectfully submitted,

By:____/s/___________
John Scola

Law Office of John A. Scola, PLLC
Attorneys for Plaintiff Howard Singer
90 Broad Street, 10th Floor
New York, New York 10004
(917) 423-1445
jscola@johnscolalaw.com

**DECLARATION OF PLAINTIFF**

STATE OF NEW YORK )

COUNTY OF NEW YORK )

I, HOWARD SINGER, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, the following:

That I am the Plaintiff in the within action. I have read the foregoing Complaint and know the contents thereof. The matters set forth therein are true to my own knowledge, except as to those matters alleged upon information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: New York, New York

May 22, 2026

__________/s/_______________

HOWARD SINGER, Plaintiff